UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAULT STE. MARIE TRIBE OF
CHIPPEWA INDIANS,

        Plaintiff,

                                          Case No. 2:06-cv-276

v.                                         HON. R. ALLAN EDGAR

UNITED STATES OF AMERICA, et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

The Sault Ste. Marie Tribe of Chippewa Indians (hereinafter "the Tribe"), filed this

action against the United States of America, the United States Department of the Interior (hereinafter

"the Department"), Secretary of the Interior Dirk Kempthorne, and Philip N. Hogen, Chairman of

the National Indian Gaming Commission (NIGC). The Complaint was filed on November 8, 2006,

pursuant to the Administrative Procedures Act , 5 U.S.C. §§ 701-06, challenging the NIGC's final

decision and order disapproving a proposed amendment to the Tribe's gaming ordinance that would

have permitted gaming on a parcel of land in St. Ignace, Michigan. Presently before the Court is

Plaintiff's motion for preliminary injunction, seeking an order from this Court which would permit

the Tribe to operate its replacement casino pending final determination by this Court of the claims

presented in this lawsuit. The parties have fully briefed the issues presented and arguments were

presented to the Court on June 27, 2007. By order dated May 25, 2007, this matter was referred to

the undersigned for a Report and Recommendation.

**FACTS**

Sometime in 1986, a casino was opened by the Tribe in St. Ignace, Michigan, on lands taken into trust in 1983.  This land is referred to as "the 1983 parcel."  The casino opened in 1986 and was expanded on several occasions with add-on facilities.  Eventually, the Tribe concluded that the casino facilities provided inadequate heating, ventilation, air conditioning and sewage disposal, and that the casino had to be replaced.  The Tribe concluded that to continue to be competitive in the gambling market, it needed to construct a state of the art casino, hotel and restaurant in St. Ignace.  In July of 2003, the Tribe sent a letter to the local office of the Bureau of Indian Affairs (BIA), indicating that it wanted to construct a new casino that straddled a parcel of land where the Tribe's current casino was located and another parcel of land taken into trust in 2000 (hereinafter "the 2000 parcel").  The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2107, *et. seq.*, prohibits gaming on land acquired into trust by the United States for the benefit of a tribe after the Act's effective date of October 17, 1988.  The casino built in 1986 was located on a parcel of land taken into trust in 1983 and was therefore eligible for gaming.  The parcel of land taken into trust in 2000 was acquired in 1992.  To establish that it was authorized to construct a casino on the 2000 parcel, the Tribe sent a letter in July of 2003 requesting that it be authorized to construct a casino that straddled the 1983 parcel and the 2000 parcel.  The letter the Tribe sent to Defendants indicated that the Tribe believed the 2000 parcel fit within one of two exceptions to the IGRA, which would permit the Tribe to conduct gambling on the 2000 parcel.  First, the Tribe maintained that the 2000 parcel was located "contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988," 25 U.S.C. § 2719(a)(1).  The Tribe also maintained that the 2000 parcel was land taken into trust as part of "the restoration of lands for an Indian tribe that is restored to federal recognition."  25 U.S.C. § 2719(b)(1)(B)(3)(I).

In August of 2003, the BIA Midwest Regional Director sent a letter to the Tribe requesting additional information and indicating that "several issues which will require further legal analysis" were presented by the Tribe's request. In November of 2003, the Tribe submitted the additional information requested. During the next seven months, the Tribe sent two letters to Defendants requesting that Defendants notify the Tribe of Defendants' decision at its "earliest convenience" so that the Tribe could stay on its current construction schedule for a new casino. The first letter included a statement that the Governor of the State of Michigan's legal counsel indicated that "while the issue is not free from doubt, we agree that a court could find that this original parcel constitutes a reservation for purposes of IGRA." In a letter sent by the Tribe on June 14, 2004, to George Skibine, Director of the Office of Indian Gaming Management, the Tribe described its prior efforts to obtain a legal opinion from the Department and reiterated its position regarding the application of the two exceptions that it believed entitled the Tribe to build a casino straddling the 1983 and 2000 parcels. The Tribe received a response to this letter from NIGC Acting General Counsel Penny J. Coleman, requesting additional information from the Tribe. On July 1, 2004, the Tribe responded to Attorney Coleman's request. Administrative Record at page 101 (hereinafter "AR at ___"). On July 30, 2004, Attorney Coleman sent the Tribe a letter indicating that there were "serious questions as to whether the lands constitute Indian lands on which the Tribe may conduct gaming." AR at 186. In an October 2004 letter, the Tribe was "advised against beginning construction of the facility until the Indian lands question is resolved." AR at 194. Again, the NIGC requested additional information, and that information was provided by the Tribe in November of 2004. The Tribe went forward with its plans to construct a new casino and in 2004 the Tribe approved the borrowing of $41 Million to fund this new facility. Construction began sometime in the Summer of 2004. At some point, the Tribe agreed that Defendants should consider the

applicability of the contiguous to a reservation exception first, as that request was less time consuming. AR at 196. On February 14, 2006, Defendants issued an opinion finding that the 2000 parcel did not qualify as lands contiguous to a reservation because the 1983 parcel was not a reservation as of October 17, 1988, as required for the exception to apply. AR at 6. The Tribe has never maintained that the 1983 parcel had been formally proclaimed a reservation, but maintains that the 1983 parcel is a "de facto" reservation. Plaintiff's brief (docket #26) at pages 19-20, n. 7. In March of 2006, the NIGC and the Tribe discussed the Tribe's position that the Restored Lands Exception applied. The Tribe was requested to submit additional information. On July 31, 2006, the Office of General Counsel of the NIGC issued an opinion concluding that the 2000 parcel did not meet the Restored Lands Exception to the IGRA. On September 1, 2006, the NIGC issued its final decision and order, disapproving the Tribe's request that it be permitted to game on the 2000 parcel. AR at 1-5. Shortly thereafter, in September of 2006, the Tribe closed its old casino and erected a "Sprung Structure" on the 1983 parcel where gaming is presently occurring. The Sprung Structure is now connected to the $41 Million hotel and casino, which is fully constructed.

On November 8, 2006, the Tribe filed the instant lawsuit challenging the Defendants' decision denying the Tribe the right to operate the casino straddling the 1983 and 2000 parcels. On May 24, 2007, the Tribe moved for a preliminary injunction, claiming that it would suffer immediate and irreparable harm if this Court did not permit gaming at the new casino. The Tribe seeks an order from this Court enjoining the NIGC from initiating enforcement proceedings at the casino located on the 1983 and 2000 parcels.

In support of the Tribe's request for injunctive relief, the Court is provided with the affidavit of Victor Mattson, Jr., which indicates that the Sprung Structure, where gambling is presently occurring, is "an entirely inadequate facility." Affidavit at page 8. According to the

- 4 -

affidavit, "The heating, ventilation and air conditioning system is insufficient and the physical layout is unappealing. The Tribe has received numerous complaints from employees and customers about the Sprung Structure's air quality system." *Id*. at 8. The affidavit goes on to explain that the Tribe will lose profits and that its ability to compete in the gambling industry will be irreparably harmed. The Tribe also provides the Court with the affidavit of Paul R. VanKauwenberg, who holds a Bachelor of Science in Mechanical Engineering and is a professional engineer involved in the design, supervision and installation of infrastructure utilities for buildings of various types and designs. His affidavit compares the air filtration system in the Sprung Structure with that of the recently constructed casino. His affidavit indicates that the air infiltration system in the Sprung Structure is inadequate and does not properly change the air in the facility, resulting in a high level of smoke in the facility. The Court is also provided with the affidavit of Aaron Payment, the Tribe's Chairperson. Payment's affidavit indicates that the Tribe has suffered a loss of income as a result of the Tribe's inability to open its new casino. According to Payment, the reduced income has a negative effect on the Tribe, the local community, and the state.

Kristi Little, the Tribe's Associate Executive Director - Membership Services, provides the Court with an affidavit which explains, in part:

> Additionally, the impact of gaming in building and sustaining healthier communities in rural Upper Michigan is dramatic. Any threat or sustained gaming loss would have a considerable negative economic impact in the local communities, and in local programs and services. Partnerships and services across the Eastern Upper Peninsula that would be affected include:
>
> > 1. Partnership with War Memorial Hospital for urgent care services provided at the Community Care Clinic, which is located in Sault Ste. Marie.

2.      Partnerships with Mackinaw Straits Hospital, War Memorial Hospital and Helen Newberry Joy Hospital to provide dialysis services to rural areas.

3.      Radiology, lab, and physical therapy partnerships with War Memorial Hospital.

4.      Radiology, reference lab, and EKG services provided through agreements with Marquette General Hospital and all other local hospitals.

5.      Emergency preparedness funding for joint initiatives with county and local government units.

6.      Educational partnerships for student placements through local colleges and universities. Currently, the Tribe actively provides numerous nursing student rotations for ambulatory care, community health, and social workers. The Tribe also provides clerkships and rural medicine and dental rotations for medical/dental students through Michigan State University, Northern Michigan University Rural Health Extension Program, and University of Iowa.

If gaming revenues decline, all of our programs will be negatively affected. The Tribe would not be able to employ health care staff at the current level and tribal members would experience reduced levels of care or would go without needed services. Many tribal members are without health insurance and do not have the financial means to pay for healthcare.

If the Tribe must cut back on health care services as a result of reduced income from tribal gaming operations, the first health programs cut would likely be prevention and education. Obviously, this would have a negative impact on tribal members and would exacerbate existing health problems thereby negatively affecting the quality of life for the Tribe's members.

Defendants have not provided the Court with any affidavits for consideration in conjunction with the pending motion for injunctive relief.

## ANALYSIS

The Sixth Circuit has explained that a court confronted with a request for injunctive relief must consider and balance four factors:

> 1.  Whether the movant has shown a strong or substantial likelihood or probability of success on the merits.
>
> 2.  Whether the movant has shown irreparable injury.
>
> 3.  Whether the preliminary injunction could harm third parties.
>
> 4.  Whether the public interest would be served by issuing a preliminary injunction.

*Jones v. City of Monroe*, 341 F.3d 474 (6th Cir. 2003); *Mason County Medical Ass'n. v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977).  *See also Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985; *Ardister v. Mansour*, 627 F.Supp. 641 (W.D. Mich. 1986).

The Court in *Jones v. City of Monroe* explained:

> The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met. *DeLorean*, 755 F.2d at 1228.  Moreover, a district court is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue.  *Id.; Mascio v. Public Employees Retirement Sys. of Ohio*, 160 F.3d 310, 312 (6th Cir. 1009) (affirming the district court's grant of a preliminary injunction based on the district court's conclusion that the plaintiff had demonstrated a substantial likelihood of success on the merits).

341 F.3d at 476.

The Tribe's request for injunctive relief in this case does not seek to maintain the "status quo."  In essence, what the Tribe is asking for is an order from this Court which will permit the Tribe to open its new casino without interference from Defendants.  On the other hand, the Tribe's request will not determine whether or not gambling occurs in St. Ignace, as gambling is

presently occurring in the Sprung Structure.  The Sprung Structure is adjacent and connected to the

new casino and hotel.  One court has explained:

> In some cases, however, the standard for issuance of preliminary
> injunctive relief is heightened.  If the preliminary injunction disturbs
> the status quo, is mandatory as opposed to prohibitory, or affords the
> movant substantially all the relief he may recover at the conclusion of
> a full trial on the merits, the movant must carry the heavier burden of
> showing that the traditional four factors weigh "heavily and
> compellingly" in favor of granting the injunction.
>
> The term "status quo" is not defined by the parties' existing *legal
> rights*; it is defined by the *reality* of the existing status and
> relationship between the parties, regardless of whether the existing
> status and relationships may ultimately be found to be in accord or
> not in accord with the parties' legal rights.  The Tenth Circuit has
> rejected an "absolute" approach to defining the status quo, instead
> holding that "the definition of 'status quo' for injunction purposes
> depends very much on the facts of a particular case."  The status quo
> need not be the state of affairs immediately preceding the litigation.
> The parties' definition of the status quo is at the heart of these
> proceedings and very much in dispute.

*Wyandotte Nation v. Sebelius*, 337 F.Supp.2d 1253, 1267-68 (D. Kan. 2004) (footnotes omitted).

In *Detroit Newspaper Publisher's Assoc. v. Detroit Typographical Union No. 18*, 471

F.2d 872, 876 (6th Cir. 1972), the court explained that issuance of a preliminary injunction is the

"strong arm of equity and should not occur in doubtful cases."  In *Roghan v. Block*, 590 F.Supp. 150,

153 (W.D. Mich. 1984), quoting *Detroit Newspaper Publisher's Assoc.*, 471 F.2d at 876, a judge of

this Court explained, "'There is no power the exercise of which requires greater caution, deliberation

and sound discretion or more dangerous in a doubtful case, than the issuing of an injunction.'"

The Tribe bears the burden of establishing its entitlement to injunctive relief and, as

stated above, the Court is required to consider four factors that are to be balanced in determining

whether or not injunctive relief is appropriate.

## Public Interest

One of the factors to be balanced is whether or not the public interest would be served by the issuance of a preliminary injunction. The Tribe maintains that the public interest would be best served by the granting of an injunction which would allow the Tribe to open its new casino. According to the affidavits filed by the Tribe, the public interest would be best be served by allowing the Tribe to open its new casino because that is in the best interest of social services, public safety and educational programs that benefit the Tribe. In addition, the Tribe maintains that the local economy would benefit by allowing the new casino to open. The affidavits presented to the Court by the Tribe, which have not been rebutted by Defendants, establish that the Sprung Structure is an unhealthy and unsafe environment and the casino's employees and patrons would benefit from a healthier and safer environment if gambling is allowed to occur in the new casino. This case does not present a question of whether or not the public is better off by not having gambling, as gambling is already occurring in the Sprung Structure. Thus, the Court is not presented with that question. The record also supports the Tribe's argument that allowing the new casino to open will allow the Tribe to better compete in the gambling market in Northern Michigan.

Defendants maintain that Plaintiff's assertion that gambling in the Sprung Structure produces less revenue is speculative. Furthermore, it is Defendants' position that it is in the public interest that the law be followed. Finally, Defendants argue that other tribes operating casinos in Michigan would benefit if Plaintiff is not allowed to open its new casino. Having carefully considered the arguments of the parties, and in particular considering the affidavits filed by Plaintiff, I conclude that the public interest factor supports Plaintiff's request for an injunction.

### Harm to Third Parties

The Tribe maintains that permitting the Tribe to operate its new casino will not cause harm to any third parties.  Defendants respond that other tribes will be harmed if Plaintiff is permitted to game in its new casino.  This argument is somewhat inconsistent with the argument made by Defendants that Plaintiff has not shown that it faces a competitive disadvantage by being required to game in the Sprung Structure.  Defendants refer the Court to the case of *Sault Ste. Marie Tribe of Chippewa Indians v. United States*, 288 F.3d 910 (6th Cir. 2002), in which the Tribe sought a preliminary injunction seeking to enjoin the Little Traverse Bay Band of Odawa Indians from gaming at a Petoskey site, arguing that allowing that tribe to game in Petoskey would affect the gaming market in St. Ignace.  That case is somewhat distinguishable from the instant case in that it involved an effort to prohibit gaming in Petoskey, not change the location by a few hundred feet.  More importantly, the evidence of record is sparse on the issue of whether or not the issuance of an injunction would cause harm to third parties.  The evidence of record does not support a finding that third parties will be harmed should an injunction issue permitting the Tribe to operate its new casino.

### Irreparable Injury

The next factor that must be considered is whether or not the Tribe will suffer irreparable injury if the requested injunctive relief is not granted.  Defendants maintain that the Tribe has not shown that it will suffer irreparable injury without injunctive relief.  According to Defendants, the factor of irreparable injury is the single most important factor to be considered in ruling on a motion for preliminary injunction.  The Tribe has presented evidence in the form of affidavits establishing that it has suffered a loss of revenue as a result of its inability to open the new casino.  The Tribe is now operating its gaming activities out of the Sprung Structure and is unable to use the casino portion of the $41 Million facility the Tribe has constructed.  In most cases, a

monetary loss will not support a claim for injunctive relief as such injury would be compensated by monetary damages. In the instant case, monetary damages are not available to Plaintiff because the United States Government is the defendant. *See Grosjean v. American Press Co., Inc.*, 297 U.S. 233, 242 (1936); *Ohio Oil Co. v. Conway*, 279 U.S. 813, 814 (1929). *See also Tristano v. Federal Bureau of Prisons*, 2004 WL 5284511 (W.D. Wis.).

   The Tribe has provided the Court with the affidavit of Jake Miklojcik, who possesses a Bachelor of Science Degree from Carnegie Mellon University and a Masters in Public Policy from the University of Michigan. Since the 1990s, Mr. Miklojcik has provided economic and development reports, assessments and analyses for the gaming industry. Mr. Miklojcik conducted "a detailed analysis of the Sault Tribe's gaming venues in Michigan's Upper Peninsula, including the St. Ignace site." Affidavit at page 2. The affidavit of Mr. Miklojcik provides support for Plaintiff's argument that it will suffer irreparable injury if it is not permitted to open its new casino. A second affidavit of Victor Mattson, Jr., attached to Plaintiff's reply brief (docket #33), offers additional support for the Tribe's claim that it will suffer irreparable injury if it is not permitted to operate its new casino. A decrease in revenue can have a significant impact on the governmental services available to tribal members. Defendants contend that Plaintiff's argument that it will suffer irreparable injury as a result of lost gaming revenues is speculative. However, as noted above, the affidavits submitted by Plaintiff are not speculative and support the request for injunctive relief. Defendants also argue that the injury suffered by the Tribe is self-inflicted. I conclude that this argument is somewhat disingenuous. Defendants were far from timely in their responses to the Tribe's request to resolve the legal issues presented in this case.

Having carefully considered the arguments of the parties, as well as the affidavits submitted by Plaintiff, it is my recommendation that the Court conclude that Plaintiff has established that it will suffer irreparable injury should it not be permitted to open its new casino.

### Success on the Merits

The most difficult question presented by Plaintiff's request for injunctive relief is whether Plaintiff has established a likelihood of success on the merits.  Plaintiff challenges two decisions made by Defendants in this action.  First is the decision issued in the February 14, 2006, letter written by Edith Blackwell, Acting Associate Solicitor, Division of Indian Affairs, to Philip N. Hogen, Chairman of the NIGC.  That letter concludes that the Tribe's 1983 parcel does not constitute a reservation for purposes of the IGRA and, therefore, gaming on the 2000 parcel is not permitted by virtue of being on land contiguous to a reservation pursuant to 25 U.S.C. § 2719(a)(1).  The second decision is found in the memorandum dated July 31, 2006, to Philip N. Hogen from Penny J. Coleman in which Defendants conclude that the St. Ignace parcel does not qualify as "the restoration of lands for an Indian tribe that is restored to federal recognition."  These decisions became the final decision and order of NIGC on September 1, 2006, in the order issued by Philip N. Hogen, Chairman, and Cloyce V. Choney, Commissioner.

The question of Plaintiff's likelihood of success on the merits presents difficult legal issues which this Court must face in ultimately resolving the questions presented by this lawsuit. In considering the likelihood of success on the merits, the first question confronting the Court is the appropriate standard of review to be given to the decisions of the NIGC.  Defendants maintain that the NIGC's decisions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance of law."  5 U.S.C. § 706(2)(a)(1988); *see also Communities, Inc. v. Busey*, 956 F.2d 619, 623 (6th Cir. 1992).  According to Defendants:

> An agency decision is arbitrary and capricious only if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Wilson Air Center, LLC v. FAA*, 372 F.3d 807, 813 (6th Cir. 2004). While the court must conduct "a thorough, probing, in-depth review," the "ultimate standard of review . . . is a "narrow one" and "'[t]he court is not empowered to substitute its judgment for that of the agency.'" *Simms v. Nat'l Highway Traffic Safety Admin.*, 45 F.3d 999, 1003 (6th Cir. 1995) (quoting *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)).

Defendants' response (docket #31) at pages 19-20.

Defendants maintain that the proper test was set forth by the court in *Chevron, U.S.A., Inc. v. Natural Resources Defenses Council, Inc*., 467 U.S. 837 (1984). According to Defendants, under *Chevron*, where a statute is unambiguous, the Court, as well as the agency, must give effect to the unambiguous expressed intent of Congress. Where a statute is ambiguous, the question presented to the Court is whether the agency's decision is based on permissible construction of the statute. Defendants maintain:

> The "restoration of lands" component of the NIGC decision is entitled to deference, as it gives effect to the plain language of IGRA, and the "contiguous to a reservation" component of the decision is entitled to deference because it is a permissible construction of an ambiguous statutory provision.

Defendants' response (docket #31) at pages 21-22.

According to Plaintiff, Defendants' decision is not entitled to *Chevron* deference because Defendants' decision on the two issues presented fails to apply the Indian canon of statutory construction, providing that ambiguous statutes are to be construed in favor of Indians. Plaintiff makes a persuasive argument that it is entitled to application of the Indian canon of statutory

- 13 -

construction with respect to the "reservation" component of the NIGC decision in this case.  In my opinion, it is not, however, necessary to resolve this legal question in order to resolve the issues presented by Plaintiff's motion for injunctive relief.  Applying *Chevron* deference to the reservation component of the NIGC decision, it is my recommendation that the Court find that Plaintiff has established a substantial likelihood on the success on the merits of this claim.

The reservation component of Defendants' decision is found in the February 14, 2006, letter of Edith R. Blackwell to Philip N. Hogen.  The letter begins by explaining that the 1983 parcel of land was never proclaimed a reservation.  This is not in dispute by either party.  The letter then goes on at great length to state that gaming could be permitted on the 2000 parcel only if it is contiguous to reservation land.

Thus, for gaming to be authorized on the 2000 parcel, the 1983 parcel must be considered "reservation" land.  As stated above, the 1983 parcel was never declared a reservation.  Plaintiff maintains that the 1983 parcel is a de facto reservation.  The February 14, 2006, letter explains:

> There is not a single established uniform definition of reservation elsewhere in federal statutes.  Although several federal statutes define the term, the definitions vary greatly based upon the intent of the program and are generally not helpful for the present analysis.  Some of these definitions define reservation in terms of trust land.  Such definitions are not controlling, however, because of the differentiation in the IGRA between trust land and reservation.  This differentiation suggests that something more than a mere set aside of land into trust by the Federal government is required for a reservation under the Act and necessitates a definition of reservation that is specific to the needs and requirements of the IGRA.

The letter goes on to explain, quoting the case of *Sac and Fox Nation of Missouri v. Norton*, 240 F.3d 1250 (10th Cir. 2001), that land preserved in a treaty for purposes of an Indian cemetery was not a reservation for purposes of the IGRA because it was not for the residence of tribal Indians.  The

letter explains, "Although *Sac and Fox* requires residence in order to be a reservation, it does not state the reverse proposition that land used for tribal housing is a reservation.  Therefore, we do not conclude that *Sac and Fox* decides the issue presented here."  Letter at page 7.  The letter explains that, "absent additional evidence that indicates a federal intent that the 1983 parcel was to serve as the Tribe's permanent settlement, it is not reservation within the meaning of the IGRA."  *Id.* at 9.  In concluding that the parcel was not a de facto reservation, the letter refers to two cases, *United States v. Sandoval*, 231 U.S. 28 (1913), and *United States v. McGowan*, 302 U.S. 535 (1938).  These cases equated the question of whether or not there was criminal jurisdiction over land with whether or not that land was reservation land.  These cases are not particularly helpful in understanding Defendants' position in this case, as conceded at oral argument by counsel representing Defendants.  The letter clearly implies that residence alone is not enough to make a parcel of land a de facto reservation.  The letter explains, "We conclude, therefore, that neither residential use by tribal Indians on trust land, nor the exercise of tribal jurisdiction, is the determinative factor in defining reservation under the IGRA."  It is difficult, if not impossible, to glean from the letter of February 14, 2006, what factors are utilized in determining whether or not a parcel of land is "reservation" land.

During oral argument, counsel for Defendants conceded that the 1983 parcel in St. Ignace was for all practical purposes identical in use to the reservation land of the Tribe located in Sault Ste. Marie, Michigan.  Although the use of the two parcels of land appears to be identical, one is considered a reservation and the other is not.  At the same time, a Sugar Island parcel of land, which has very few uses by the Tribe, was considered reservation land by proclamation.  During oral argument, the undersigned repeatedly attempted to have counsel for the Defendants identify what factors are utilized in determining whether a parcel of land is reservation land.  Counsel was unable to clarify this for the Court.  In fact, at the conclusion of oral argument, it appeared to the

undersigned that Defendants' position is that land is reservation land if Defendants conclude it is, and is not reservation land if they conclude otherwise.

As the court explained in *Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001):

> This time the Tribe argued before the district court, "without reference to and despite the history of the Reserve," that the Tribe's activities with regard to the tract subsequent to Miami Tribe I established the Tribe's jurisdiction over the tract. [*Miami Tribe of Okla. v. United* States 5 F.Supp.2d 1213, 1218 (D. Kan. 1998)]. The court in Miami Tribe II, however, declined to resolve the Tribe's argument. Rather, the court concluded that the NIGC's decision not to approve the proposed gaming management contract should be set aside as an abuse of discretion because the NIGC failed to provide a "reasoned explanation" why the Tribe, in view of its recent activities, had not established jurisdiction over the tract, and did not now exercise governmental power over the tract. *Id*. at 1218. The court further noted that limitations in the administrative record prevented it from concluding the NIGC's decision was the product of "reasoned decisionmaking." *Id*. at 1219. The court cited as troublesome the NIGC's lack of reference to tribal ordinances and other activities that the Tribe asserted were examples of its exercise of jurisdiction and governmental power over the tract. The district court therefore remanded the matter to the NIGC for further proceedings related to the proposed gaming management contract.
>
> * * *
>
> The NIGC's failure to thoroughly analyze the jurisdictional question in its most recent decision likely renders its conclusion that the tract constitutes "Indian lands" within the meaning of IGRA arbitrary and capricious. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574-76 (10th Cir. 1994) (discussing arbitrary and capricious standard).

*Id*. at 1220-1229.

The *Kansas v. United States* case presents different facts and a different legal question from that presented in this case. What is similar is the Defendants' failure to provide a reasoned explanation for its decision.

- 16 -

After thoroughly reviewing the February 14, 2006, letter, I conclude that Defendants have failed to provide a reasoned explanation for its conclusion that the 1983 parcel is not reservation land.  As counsel representing Defendants stated at oral argument, "The letter is clearly struggling with this definition of reservation.  There is no question about it.  The problem is that reservation is not defined in IGRA, so the Department went about trying to interpret what is a reservation by looking at, you know, where cases talk about it."  In some respects, it is difficult to determine whether or not the decision of the Defendants, as made in the February 14, 2006, letter, is arbitrary and capricious because the letter is so confusing.  As quoted above, the letter states that absent additional evidence that indicates a federal intent that the 1983 parcel was to serve as the Tribe's permanent settlement, it is not a reservation within the meaning of the IGRA.   No explanation as to what additional evidence could be considered was provided in the letter.  The record reflects that the 1983 parcel was intended to be used in exactly the same manner and for the same purposes as the reservation land in Sault Ste. Marie.  No explanation is given as to why the 1983 parcel is not reservation land and the Sault Ste. Marie parcel is reservation land.  In their response and at oral argument, Defendants maintain that the 1983 parcel could only be reservation land if Defendants so proclaimed it before 1988.  This position is not consistent with  Defendants' decision as reflected in the February 14, 2006, letter.  The decision indicates that some set of factors could support a finding that the 1983 parcel is a de facto reservation.  However, those factors are never identified.  The decision of February 14, 2006, is wholly inadequate in explaining the basis for Defendants' conclusion.

Defendants' position that the 1983 parcel could only be considered reservation land if it had been proclaimed such in 1988, is inconsistent with the February 14, 2006, letter and the actions of the Defendants in this case.  If, as Defendants' maintain, the only basis the 1983 parcel

could be concluded a reservation was by proclamation in 1988 or before, Defendants would not have taken years to answer Plaintiff's request nor sought additional information on more than one occasion.

Defendants admit that the term "reservation" is an ambiguous one and that the pro-Indian canon requires the IRGA to be construed in favor of Indians. Defendants' response (docket #31) at pages 22-24. Defendants go on to indicate, "The NIGC and the Department as federal agencies [are] charged with overseeing implementation of IGRA on a consistent, uniform, basis across the nation, the pro-Indian canon of statutory construction should not be applied in this case to supplant the traditional deference afforded to agency interpretations of statutes that they are charged with administering." Defendants' response (docket #31) at page 26. Defendants' decision on the reservation component of Plaintiff's claim is far from "consistent and uniform." As Plaintiff points out, what Defendants have done is argue what does not constitute a reservation, without describing what a reservation is and why the 1983 parcel was found not to be a reservation. The February 14, 2006, letter did state, "We do not conclude that a tribe must have proclaimed reservation in order to game or have a reservation reserve from cession." February 14, 2006, letter at page 9. The 1983 parcel provides tribal housing, health services, educational services and social services, and is for all practical purposes identical from a use perspective with the reservation in Sault Ste. Marie, Michigan. This would appear to meet the definition of a reservation found in 18 U.S.C. § 1151(a). *See also Sac and Fox Nation of Missouri v. Norton*, 240 F.3d 1050 (10th Cir. 2001).

One final factor the Court should consider in deciding whether or not injunctive relief should be issued is the equities. As one Treatise has explained:

On an application for a preliminary injunction or a restraining order, the court, in the exercise of its discretionary powers, will balance the equities and consider the relative inconvenience or hardship to the parties resulting from its decision to grant or deny relief.

As a general rule, in determining whether to grant a temporary or preliminary injunction, or a restraining order, it is proper for the court to weigh the equities and balance the relative positions of the parties with respect to benefits, convenience, harm, hardship, injury, and resulting damage. The court will also consider public interest factors.

Once the court, on a motion for a preliminary injunction, is satisfied that the conditions for such relief have been met, it must consider the harm that the non-moving party will suffer if the injunction is granted, balancing it against the irreparable harm to the moving party from the denial of relief. The ultimate goal of any test used in deciding whether a preliminary injunction should issue is to minimize the harm which an erroneous interim decision may cause. Therefore, on an application for a preliminary injunction, the court, in the exercise of its discretionary powers, will consider the traditional balance of convenience; this is to say, it will consider whether a greater injury would be done by granting the injunction than would result from a refusal to do so. The court must exercise its discretion in favor of the party most likely to be injured.

43A C.J.S. Injunctions § 82 (2007) (footnotes omitted).

The balancing of equities in the present case clearly supports issuance of the injunctive relief requested. Plaintiff has a $41 Million facility which cannot be used for its intended purpose. Defendants' actions or inactions, in part, are responsible for the current situation. The harm to Plaintiff is significant. There is little, if any, harm to Defendants by permitting gaming to occur a few hundred feet from the spot where gaming is currently occurring. Defendants will not suffer an injury if the injunctive relief is granted. If, upon a full review of the claims presented in this lawsuit, the Court concludes Defendants' position is legally supported, Defendants will be vindicated and will not have suffered an injury. On the other hand, if Plaintiff is not permitted to use its facility, the injury could be devastating.

Accordingly, it is respectfully recommended that the Court conclude that Plaintiff has established a substantial likelihood of success on the merits of the "reservation" component of their claim.[1]

## CONCLUSION

It is respectfully recommended that the Court conclude that, balancing the four factors enunciated by the Sixth Circuit in *Jones v. City of Monroe*, 341 F.3d 474 (6th Cir. 2003), Plaintiff is entitled to injunctive relief.  It is further recommended that an order should issue permitting the Tribe to operate its new casino on the 2000 parcel pending resolution of this case.

**NOTICE TO PARTIES**:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR. 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal those issues or claims addressed or resolved as a result of the Report and Recommendation.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).

 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:   July 23, 2007

---

[1]  Based on this recommendation, it is not necessary to determine whether or not there is a substantial likelihood of success on the merits of the "restored lands" component of Plaintiff's claim.  However, the undersigned notes that the July 31, 2006, memorandum from Philip N. Hogen to Penny J. Coleman does not suffer from the inadequacies of the February 14, 2006, letter.  The memorandum is well-reasoned and adequately explains the basis for Defendants' decision and is, in my opinion, on sound legal ground.  This is not, however, an indication that I have concluded that Plaintiff could not prevail on this claim.