UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAULT STE. MARIE TRIBE OF
CHIPPEWA INDIANS,

      Plaintiff,

v.

UNITED STATES OF AMERICA,
et al.,

      Defendants.

_____/

Case No. 2:06-cv-00276
HON. R. ALLAN EDGAR

**MEMORANDUM**

This matter is before the court on the parties' cross-motions for summary judgment.

Plaintiff Sault Ste. Marie Tribe of Chippewa Indians ("Sault Tribe" or the "Tribe") seeks a

judgment from this court that it is entitled to conduct "Class III Gaming" on a parcel of its trust

land pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § § 2701-21.  [Court

Doc. No. 61].  Defendants United States of America, the National Indian Gaming Commission

("NIGC") and its Chairman, and the Department of the Interior (the "Department") and its

Secretary (collectively "Defendants") oppose the Tribe's motion and move for summary

judgment seeking this court's affirmance of their decision to deny the Tribe the right to conduct

"Class III Gaming" on their trust land.  [Court Doc. No. 76].

The case revolves around the interpretation of two provisions under the IGRA.  These

provisions relate to exceptions to the limitation of certain types of Indian gaming.  *See* 25 U.S.C.

§§ 2719(a)(1) and 2719(b)(1)(B)(iii).  Class III gaming refers to casino style gaming, such as slot

machines, black jack, and roulette.[1]  The Tribe seeks this court's review of agency action

pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, relating to the Secretary

of the Interior's right to proclaim new Indian reservations.  25 U.S.C. § 467.

The court has reviewed the administrative record, the arguments of the parties, the

relevant statutes, cases, and agency decisions.  In addition, the court has heard the parties argue

the merits of the issue at a hearing on the motions.  The motions are now ripe for this court's

review.  After a careful analysis of the relevant issues, the court determines that it will GRANT

the Tribe's motion for summary judgment and DENY the Defendants' motion for summary

judgment.

## I.      Background

The essential relevant facts are undisputed by the parties in this matter.  For the most part,

the parties do not dispute that the Tribe has roots in the Upper Peninsula and northern portions of

Michigan that stretch back in years to the period of time prior to the arrival of white settlers in

the area.  As the Chairman of the Tribe, Aaron Payment, explains: "The Sault Tribe is the

modern day political organization of the Chippewa bands which inhabited the eastern portion of

the Upper Peninsula of Michigan since before the coming of Europeans."  Administrative Record

("A.R."), p. 394 (Affidavit of Aaron Payment ("Payment Aff."), ¶ 1).  The parties do not dispute

the Tribe's ties to the area.  The NIGC opinion dated July 31, 2006 admits that the "Tribe has a

---

[1]  The IGRA defines "Class III gaming" by stating that it means "all forms of gaming that are not class I gaming or class II gaming."  *See* 25 U.S.C. § 2703(8).  It is not "class I gaming" which the IGRA defines as "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations."  25 U.S.C. § 2703(6).  Nor is it "class II gaming" which includes bingo and games similar to bingo or certain card games.  *See* 25 U.S.C. § 2703(7).

historical nexus to the St. Ignace parcel." A.R., p. 26.

As Chairman Payment describes it:

Under the Treaty of March 28, 1836, 7 Stat. 491, the Chippewas and Ottawas of
northern Michigan reserved extensive tracts of land for their use, while ceding the
remainder of the eastern half of the Upper Peninsula and the approximate northern
half of the Lower Peninsula to the United States. By approximately 1880,
however, almost all of these reservation lands had left Indian ownership.

Payment Aff., ¶ 3. An expert for the Tribe, Dr. Charles Cleland, a Professor of Anthropology at

Michigan State University, has described the aboriginal ties of the Tribe to the St. Ignace area:

The [Tribe] is the modern political successor to distinct historic bands of Ojibwe
peoples, who occupied five disparate geographic locations in the Upper Peninsula
of Michigan. The Constitution and Bylaws of the Sault Tribe divides the historic
Ojibwe bands into five units of the Tribe, each of which is represented on the
Board of Directors of the Sault Tribe. Unit 3 is located in Mackinac County,
Michigan, and includes the City of St. Ignace, the area surrounding St. Ignace, and
Mackinac Island. Native Ojibwe people have occupied the coast along Lake
Huron in the St. Ignace area since time immemorial. European records show that
the members of Unit 3 of the Sault Tribe have continuously occupied the St.
Ignace area since at least as early as the time the area was first visited by French
traders in the 1650s. . . . [T]he St. Ignace area is within the aboriginal territory of
the Sault Tribe. The Sault Tribe members who live in St. Ignace, and their
ancestors, have continuously occupied the St. Ignace lands, even though the
United States did not always hold those lands in trust for the benefit of the Sault
Tribe and its members residing in Unit 3. Because the Treaty of 1836 was not a
removal treaty, the native Ojibwe people of the St. Ignace were not required to,
and therefore, never left the area.
        The St. Ignace area has always been critically important to the Sault Tribe
and its members. Its strategic location on the Straits of Mackinac emphasizes its
importance for the exercise of reserved hunting, fishing, trapping, and gathering
rights pursuant to the 1836 Treaty, and it has always served as a homeland for
members of the Ojibwe bands that became part of the modern Sault Tribe.

A.R., pp. 558-559 (Affidavit of Dr. Charles Cleland, ¶¶ 5-9); *see also*, A.R., pp. 662-750 (Report

of Dr. Charles Cleland entitled *The Administrative Termination and Restoration of the Sault Ste.*

*Marie Tribe of Chippewa Indians* with attachments providing evidence of aboriginal history of

Tribe, as well as government's lack of acknowledgment of Tribe and its subsequent restoration of

Tribe).

In 1972 the U.S. Government acknowledged the Tribe.  Payment Aff., ¶ 2; *see also*, A.R., pp. 619-620.  The Tribe was organized in 1975 pursuant to the Indian Reorganization Act ("IRA"), 25 U.S.C. § 476.  *See e.g.*, *United States v. Michigan*, 471 F.Supp. 192, 204 (D.C. Mich. 1979).  On February 20, 1975 the Commissioner of Indian Affairs proclaimed a tract of land to be a reservation for the Tribe for their use and benefit effective December 13, 1974.  This parcel of land consisted of forty acres on Sugar Island.  Administrative Record ("A.R."), pp. 32-33; Payment Aff., ¶ 30.  In 1984 the Department of the Interior designated another portion of land in Chippewa County, Michigan as part of the Sault Ste. Marie Indian Reservation.  A.R., p. 88.

Since recognition by the U.S. Government in 1972, the Tribe has been acquiring tracts of land to be held in trust by the U.S. for the benefit of the Tribe.  *See* Payment Aff., ¶ 4.  These trust lands include 1,070 acres in the City of Sault St. Marie and another 567 acres located in Manistique, Wetmore, St. Ignace, Hessel, Marquette, and Escanaba, Michigan.  *Id.*  The Tribe's enrollment is approximately 33,000.  *Id.* at ¶ 5.

The U.S. took a parcel of land in St. Ignace into Trust for the Tribe in 1983, five years prior to the enactment of the IGRA.  Payment Aff., ¶ 12, A.R., pp. 413-414.  The Tribe operated one of its six casinos on the 1983 parcel of land ("1983 Trust Parcel").  The parties agree that the 1983 Trust Parcel has never been formerly proclaimed to be a reservation.  In 2000 the U.S. took another parcel of land into trust for the Tribe that is immediately contiguous to the 1983 Trust Parcel ("2000 Trust Parcel").  Payment Aff., ¶ 13.  It is the proposed operation of a Class III gaming casino on this parcel of land that is at the heart of this lawsuit.

-4-

The Tribe sought an exception to the IGRA under either 25 U.S.C. § 2719(a)(1) or 25

U.S.C. § 2719(b)(1)(B)(iii) so that it could conduct Class III gaming on the 2000 Trust Parcel.

The Tribe desired to replace the aging casino located on the 1983 Trust Parcel for several

reasons, as explained by Chairman Payment:

> the new facility, unlike the Quonset hut-type facility it will replace, will be far
> more attractive, using the most modern equipment and luxurious finishes
> available.
> The advantages of this location compared with the location of the existing casino
> are considerable:
> a.       The proposed site significantly betters the use of the natural beauty of the
> area, as compared to the site of the existing casino.
> b.       It will be a brand new facility, constructed specifically for use as a casino.
> The existing facility is outdated, with an unattractive floor plan, as well as
> woefully inadequate exterior and interior finishes.
> c.       A new facility will help the Tribe compete in an ever increasing
> competitive casino environment and hopefully assist in getting more casino goers
> to cross Mackinac Bridge.
> d.       The new casino will be a part of a destination/resort entertainment project.
> e.       If the new facility was constructed solely on the 1983 parcel, it would be
> necessary to demolish some of the Tribal HUD housing located thereon.  It is not
> clear that could be accomplished consistent with the HUD grant obtained for the
> construction of those houses.

Payment Aff., ¶¶ 14-15.  The 1983 Trust Parcel contains 59 homes for Tribal members.  *Id.* at ¶

20.  The Tribe also operates an outpatient clinical facility on the 1983 Trust Parcel.  *Id.* at ¶ 22.

The facility provides a number of services, including optometry, dentistry, and pharmacy, as well

as counseling and health education.  *Id.*  The Tribe also operates a number of facilities in

neighboring St. Ignace, such as a Tribal Court, a middle school, and a convenience store and gas

station.  *Id.*  The Tribe further operates a water supply and sewage treatment plant in St. Ignace.

*Id.*  The Tribe has an agreement under which the Mackinac County Sheriff's Office and the St.

Ignace Police Department provide law enforcement support for activity occurring on land held in

trust for the Tribe around St. Ignace.  *Id.* at ¶¶ 24-25.  A "cross-deputization" exists between the

County and City police departments and the tribal police officers.  *Id.* at ¶ 27; A.R., pp. 439-446.

The Tribe further maintains an agreement with the City of St. Ignace to provide Tribe members

with services the city provides to its residents, such as road plowing and fire protection.  *Id.* at ¶

29.

The Tribe asserts that it has sought the Bureau of Indian Affair's ("BIA") proclamation

that the 1983 Trust Parcel is a Tribe reservation on at least two occasions–one in 1986 and one in

1988.  *See* Payment Aff., ¶ 31.  The record contains two Tribal Resolutions indicating the alleged

requests for the 1983 Trust Parcel to be proclaimed a reservation.  A.R. pp. 451-452, 456-467.

The Defendants dispute this assertion of fact.  They acknowledge that they received a request for

designation of the 1983 Trust Parcel as a reservation in 1988, but they insist that they have no

record of a 1986 request being made.  Despite the Tribe's acknowledged request in 1988, the

Department failed to designate the 1983 Trust Parcel as a reservation prior to the enactment of

the IGRA, or at any other time.  Payment Aff., ¶ 31.  However, there is evidence that the

Department was moving towards proclaiming the 1983 Trust Parcel to be a reservation.  On

October 4, 1988 the Acting Superintendent for the Michigan BIA wrote a letter to the County

Board of Commissioners in St. Ignace indicating that the "letter serv[ed] as a thirty (30) day

notice of the impending proclamation."  A.R., p. 1365.  The record also indicates that the BIA

requested additional information regarding the proclamation request for a couple of years

following the request.  *See* A.R., pp. 1370-1441.  The Department never formally proclaimed the

1983 Trust Parcel to be a reservation.

The Tribe purchased the 2000 Trust Parcel in 1992, but the government did not take it

into trust until 2000.  On July 3, 2003 the Tribe's attorney wrote to the Michigan Field Office for

-6-

the BIA.  A.R., pp. 885-891.  The letter informed the BIA that "the Tribe would like to construct

a new casino on a site which straddles both parcels of trust lands–the parcel taken into trust in

1983 and the parcel taken into trust in 2000."  *Id.*  The letter continues by stating, "[t]he new

facility will be about the same or slightly smaller than the old facility, or approximately 34,000

feet of gaming space. . . . Site clearing and the construction of foundation footers will take place

this summer, and construction will begin in earnest next Spring."  *Id.* at A.R., p. 886.  The letter

further explains the Tribe's legal analysis pertaining to the two exceptions under the IGRA at

issue here.  *Id.*

The record demonstrates that the BIA regional office forwarded the letter to the

Department suggesting that a Solicitor's Opinion might be needed.  A.R., p. 884.  On August 14,

2003 the Regional Director of the BIA's Midwest Regional Office responded to the Tribe's

Chairman regarding the July 2003 letter and sought additional information.  *See* A.R., p. 904.  On

November 5, 2003 the Tribe's attorney responded to the Regional Director enclosing copies of

the property deeds for the 1983 and the 2000 Trust Parcels.  A.R., pp. 904-905.

On December 2, 2003 a Deputy Legal Counsel for the Governor of Michigan wrote a

letter to the Tribe's attorney indicating that "[w]hile the issue is not free from doubt, we agree

that a court could find that this original parcel constitutes a 'reservation' for purposes of IGRA

and thus may permit the use of the adjacent parcel in the manner you have proposed, especially

since the proposed project does not contemplate any significant increase in the gaming activities

that have long been taking place at the original site."  A.R., pp. 920-21.  On December 9, 2003

the Tribe's attorney forwarded the Deputy Legal Counsel's letter to the Regional Director of the

BIA's Midwest Regional Office.  A.R., p. 922.  The letter concludes that "[t]he Tribe would

-7-

appreciate your advising me as soon as possible regarding whether you agree with the Tribe's position.  In order for the Tribe to stay on its construction schedule, the Tribe needs the Department's acknowledgment at its earliest convenience that the Tribe's plans are consistent with the [IGRA]." *Id.*  The Tribe's attorney forwarded a similar letter to the Director of the Indian Gaming Management Staff at the BIA on the same date.  A.R., p. 926.

On February 24, 2004 the Tribe's Chairman wrote a letter to the Regional Director of BIA's Midwest Regional Office seeking "an immediate response to our counsel's letter to the Michigan Superintendency, dated July 3, 2003 . . . ." A.R., p. 928.  The letter concluded, "[i]n order for the Tribe to stay on its construction schedule, the Tribe needs the Department's acknowledgment at its earliest convenience that the Tribe's plans are consistent with IGRA.  Any assistance you can provide to move things along would be greatly appreciated." *Id.* at A.R., p. 930.

On June 14, 2004 the Tribe's attorney again wrote the Director of the Office of Indian Gaming Management for the BIA, who forwarded the letter to the Acting General Counsel for the NIGC.  *See* A.R., p. 931.  On June 17, 2004 Acting General Counsel for the NIGC wrote the Tribe's attorney seeking any additional documentation or analysis supporting the Tribe's position.  *Id.*  On July 1, 2004 the Tribe's attorney responded to the June 17th letter by outlining the Tribe's correspondence with various government agencies over the previous year regarding its position on its right to game on the 2000 Trust Parcel.  *Id.* at A.R., pp 101-103.

On July 30, 2004 the Acting General Counsel for the NIGC wrote a letter to the Tribe's attorney, indicating that "I understand that the Tribe's construction plans are imminent and wanted to notify you that I have serious questions as to whether the lands constitute Indian lands

on which the Tribe may conduct gaming.  This initial response should not be considered my legal

opinion on this matter but an indicator that the Tribe may want to forestall construction plans

while the issues are more carefully considered." A.R., p. 932.

On August 12, 2004 the Tribe's counsel expressed his disappointment at the NIGC's

initial impression of the Tribe's request.  His letter again outlines the Tribe's legal analysis of the

two possible exceptions to the IGRA.  A.R., pp. 934-938.  The letter also explained that the Tribe

had sought the Secretary's proclamation that the 1983 trust parcel was a reservation in 1986 and

in 1988, but never received a response.  The letter concluded with the following paragraph:

> . . . as we have previously explained, and as the NIGC well knows, gaming is a
> highly competitive endeavor.  In order to maintain the Sault Tribe's competitive
> edge and the revenue stream so desperately needed to cover the costs of essential
> governmental services the Tribe provides to its members, it is necessary to
> proceed with improvements and to make those improvements in a timely manner.
> We have repeatedly informed the Department that the Tribe has made several
> irrevocable commitments in this regard.  While we remain willing to provide you
> with any information you request and are also open to meeting with you, we have
> no choice but to press ahead.

A.R., p. 938.  On September 7, 2004 a staff attorney at the NIGC wrote the Tribe's attorney

requesting additional information.  A.R., p. 941.

On October 5, 2004 after receiving a request from the NIGC, Michigan's Attorney

General wrote the NIGC reemphasizing the state's views on the Tribe's proposal to build a new

casino.

> The Attorney General shares the concern of the [NIGC] and others about
> any unjustifiably expansive readings given to IGRA by the courts.  Regrettably,
> many people feel that they have no voice in a decision to locate a casino in their
> community.  In this case, however, it is my understanding that the city of St.
> Ignace has supported the construction of the replacement casino.
> Furthermore, it is my understanding that you have a copy of a December 2,
> 2003 letter written by John Wernet to the Sault Tribe addressing the same issue.
> As Mr. Wernet noted, my office provided legal advice to Mr. Wernet prior to his

-9-

sending the letter.  Without violating my client's confidences, I can direct you to the analysis Mr. Wernet made of this issue.

A.R., p. 942.  On October 15, 2004 an NIGC staff attorney wrote the Tribe again asking for

certain information and stating that she "would advise against beginning construction of the

facility until the Indian lands question is resolved."  A.R., p. 943.  On November 3, 2004 the

Tribe's attorney supplied the NIGC with additional information the agency had requested.  A.R.,

pp. 945-1126.

On December 10, 2004 a staff attorney for the NIGC again wrote the Tribe seeking

additional information, including evidence of Tribal housing on the 1983 Trust Parcel.  A.R., p.

1128.  On March 22, 2005 the Tribe's attorney supplied the NIGC with the affidavit from

Chairman Payment that described the uses of the 1983 Trust Parcel, as well as additional

supporting information.  A.R., pp. 393-477.

On January 11, 2006 Chairman Payment wrote the Assistant Secretary of Indian Affairs

with the Department of the Interior requesting a meeting to discuss the casino proposal on the

2000 Trust Parcel.  A.R., p. 1219-1220.

On February 14, 2006 the Office of the Solicitor for the Department of the Interior issued

its first opinion regarding the application of the exception outlined in 25 U.S.C. § 2719(a)(1).

A.R., pp. 6-15 ("February 14th Opinion").  The letter determined that the 2000 Trust Parcel did

not fit the "contiguous to a reservation" exception because the 1983 Trust Parcel had never been

proclaimed a reservation.

Following the Department's opinion on the first of the two possible exceptions under the

IGRA, the NIGC began working on its opinion regarding the "restored land" exception pursuant

to 25 U.S.C. § 2719(b)(1)(B)(iii).  *See* A.R., p. 503.  On March 14, 2006, the Tribe's attorney

submitted a response to the February 14th Opinion.  A.R., pp. 508-523.  On March 27, 2006 the

Tribe began outlining its analysis of the "restored lands" exception under the IGRA.  A.R., pp.

541-568.  Throughout the spring of 2006, the Tribe marshaled its arguments regarding the

"restored lands" exception to the NIGC.

On May 9, 2006 the NIGC sent the Tribe's Chairman and attorney a letter entitled,

"Warning Notice."  A.R., p. 584.  The letter states in part:

> As a follow up on our meeting of March 10, 2006, . . . I am once again warning
> the [Tribe] that opening its new casino in St. Ignace, Michigan will violate the
> [IGRA]. . . . We expect to finish our analysis in the near future.  At that time, it is
> very likely that the Chairman will take action to close the new casino if you
> proceed to open it.  We strongly encourage the Tribe not to open . . ."

A.R., pp. 584-85.  On May 17, 2006 Chairman Payment sent a letter to the NIGC in response to

the "Warning Letter."  A.R., pp. 593-598.  The letter states in part:

> The Sault Tribe has invested more than $41 million in the replacement casino.  As
> noted above, the debt must be serviced and cannot without grave financial
> consequences if the replacement casino is prevented from operating.  The
> revenues from the replacement casino will not only be necessary to service the
> debt, but also to continue to maintain tribal governmental services so vital to the
> Tribe's members.  These services include health care, educational services, law
> enforcement, the operation of tribal government, and the like.  In addition, the loss
> of additional jobs at the St. Ignace casino, many of which are held by non-Indian
> members of the local community, will cause a rippling effect of financial hardship
> in that area, an adverse effect that is neither necessary, nor appropriate.

A.R., pp. 597-598.

On June 7, 2006 NIGC's Acting General Counsel drafted a letter to the Tribe reviewing

the NIGC's view of the past history of communication between the parties.  A.R., pp. 625-528.

The letter concludes that "[w]e have consistently acted as early as possible to protect the Tribe

from needlessly spending money on a facility that might never open. . . . In light of this history,

we believe that our office has taken every possible step to warn the Tribe that it might be

-11-

developing a gaming operation that it could not legally operate." A.R., p. 627. The Tribe continued to provide the NIGC with evidence that the "restored lands" exception applied to the 2000 Trust Parcel.

However, on July 31, 2006 the NIGC issued its opinion that the 2000 Trust Parcel does not fit into the "restored lands" exception to the IGRA. A.R., pp. 779-794 ("July 31st Opinion"). Foreseeing an expensive and protracted legal battle over the issue of gaming on the 2000 Trust Parcel, the Tribe's attorney wrote a letter to the Midwest Regional Director of the BIA on August 2, 2006 suggesting that the BIA consider making a proclamation of reservation status for the 1983 Trust Parcel, retroactive to 1988. A.R., pp. 1293-1297.

On August 16, 2006 the Midwest Regional Director directed a memorandum to the Assistant Secretary of Indian Affairs analyzing whether the 1983 Trust Parcel could be proclaimed a reservation retroactive to 1988. A.R., pp. 1299-1302. The memo indicates that evidence exists that the Tribe sought proclamation for the 1983 Trust Parcel in 1986 and again in 1988 and notes that "[w]e have not been able to determine why it initially took the Bureau over two years to respond to the Tribe's first request in 1986." A.R., p. 1299. The memorandum describes the history of the Tribe, as well as its restoration to federal recognition. A.R., p. 1300.

The memorandum concludes that the 1983 Trust Parcel constitutes a reservation and indicates a proclamation could be made retroactive to 1988, prior to the passage of the IGRA:

> The St. Ignace area has the second largest concentration of tribal members after the Sault Ste. Marie area. Developments on the parcel since its trust acquisition demonstrate[] that the parcel has provided a permanent homeland for tribal members living in the St. Ignace area and is the largest tribal housing project in the area, providing 59 homes for tribal members.
>
> The Lambert Center, an outpatient clinical facility, funded in part by Indian Health Service is also located on the parcel and operated by the Tribe. The

facility is over 12,000 square feet, employs 46 people, of whom 32 are tribal members.  The Center provides numerous services, including optometry, dentistry, pharmacy, family services, counselors for substance abuse, community health nurses and technicians, and health educators.

The Tribe operates a casino on the parcel, which employs 278 people, of whom 139 are tribal members.  Revenue from the casino supports the delivery of services to tribal members.  The Tribe maintains other facilities and programs in the St. Ignace area for tribal members, including a Tribal Youth Facility, Tribal Court, St. Ignace Middle School and other educational programs, MidJim Convenience Store and gas station, and a water supply and sewage treatment system.

The St. Ignace property lies within the Tribe's aboriginal territory.  The Tribe is one of the modern political successors to the Chippewa and Ottawa Bands that were signatories to the two treaties of cession. . . .

Additionally, in 2000, the United States took into trust the adjacent parcel of land.  The 2000 parcel is contiguous to the 1983 St. Ignace Housing Site parcel, which is a "reservation" within the meaning of 18 U.S.C. Section 1151, and the United States Court of Appeals' interpretation of that term in *Sac and Fox Nation v. Norton*, 240 F.3d 1250 (10th Cir. 2001).  This trust acquisition was approved by the Field Representative, Michigan Agency, on July 19, 2000, and the warranty deed was recorded with the Bureau's Land Titles and Records Office on March 1, 2001, under document number 469-98, which created Tribal tract number 469-T38. . . .

From our research we do not believe there is any law or regulation to prevent the Secretary from making the effective date of the proclamation retroactive to 1988, which is the second time the Tribe requested the Bureau to proclaim the St. Ignace parcel as a reservation.

A.R., pp. 1301-1302.

On September 1, 2006 the NIGC issued its Final Decision and Order concluding that neither exception under the IGRA applied to the 2000 Trust Parcel.  A.R., pp. 1-5.  On November 8, 2006 the Tribe filed suit in this court seeking review of the Department of the Interior's February 14th Opinion and the NIGC's July 31st Opinion.  [Court Doc. No. 1].

On December 8, 2006 the Office of the Solicitor for the Department wrote the Tribe's

attorney disavowing the memorandum written by the Midwest Regional Director and indicating

that "[o]nly the Office of the Solicitor has authority to provide legal advice within the

Department . . . Any interpretation of IGRA in that memorandum that conflicts with the February

14, 2006, letter is without authority and not the position of the Department." A.R., p. 1353.  The

letter indicated that the Department would not proclaim the 1983 Trust Parcel to be a reservation

retroactively.  The December 8th letter also clarified the Department's ruling in the February 14th

Opinion.  The letter states in part:

> You interpret our February 14, 2006, letter as providing that all land within the
> meaning of 18 U.S.C. § 1151(a) is also a reservation within the meaning of IGRA.
> This reading is incorrect.  In our full discussion of § 1151(a), we qualified our
> reference to § 1151(a) with "a declared or proclaimed reservation."  This qualifier
> was omitted in the other two references to 18 U.S.C. § 1151(a) in our February 14
> letter.  Our references were intended to be declared and proclaimed reservations,
> not § 1151(a) in general.

A.R., p. 1352-53.  The letter concluded that the IGRA could not be interpreted in the manner

requested by the Tribe.  A.R., p. 1354.  In May of 2007, the Tribe moved for a preliminary

injunction to prevent the Defendants from taking action against the Tribe for operation of the

new casino on the 2000 Trust Parcel. [Court Doc. No. 26].  In August this court accepted and

adopted the magistrate judge's report and recommendation granting the Tribe's motion for

preliminary injunction. [Court Doc. Nos, 40, 50].

## II.     Standard of Review

The parties disagree on the appropriate standard of review in this court.  Defendants argue

that its decisions should only be set aside if they failed to comply with 5 U.S.C. § 706(2).  This

provision of the APA provides that a court may set aside administrative agency findings for only

limited reasons.  Defendants argue that their decision should only be overturned to the extent that

it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A).

The U.S. Supreme Court created a test for the judicial review of an agency construction

of a statute in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837,

104 S.Ct. 2778 (1984). In that case the Court explained:

> When a court reviews an agency's construction of the statute which it administers,
> it is confronted with two questions. First, always, is the question whether
> Congress has directly spoken to the precise question at issue. If the intent of
> Congress is clear, that is the end of the matter; for the court, as well as the agency,
> must give effect to the unambiguously expressed intent of Congress. If, however,
> the court determined Congress has not directly addressed the precise question at
> issue, the court does not simply impose its own construction on the statute, as
> would be necessary in the absence of an administrative interpretation. Rather, if
> the statute is silent or ambiguous with respect to the specific issue, the question
> for the court is whether the agency's answer is based on a permissible
> construction of the statute. . . . We have long recognized that considerable weight
> should be accorded to an executive department's construction of a statutory
> scheme it is entrusted to administer, and the principle of deference to
> administrative interpretations "has been consistently followed by this Court
> whenever decision as to the meaning or reach of a statute has involved reconciling
> conflicting policies, and a full understanding of the force of the statutory policy in
> the given situation has depended upon more than ordinary knowledge respecting
> the matters subjected to agency regulations."

*Id.* at 842-843, 104 S.Ct. at 2781-2782 (quoting *National Broadcasting Co. v. United States*, 319

U.S. 190 (1943)).

Federal courts conducting review of agency decisions have described the arbitrary and

capricious standard in this way:

> An agency's rule would be arbitrary and capricious if the agency relied on factors
> that Congress has not intended it to consider, entirely failed to consider an
> important aspect of the problem, offered an explanation for its decision that runs
> counter to the evidence before the agency, or is so implausible that it could not be
> ascribed to a difference in view or the product of agency expertise. [ ] Although
> our inquiry into the facts is to be searching and careful, *this court is not
> empowered to substitute its judgment for that of the agency*. [ ]

-15-

*Michigan Gambling Opposition (MichGO) v. Norton*, 477 F.Supp.2d 1, 8 n.10 (D.D.C. 2007)(quoting *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 287-88 (4th Cir. 1999)).

Defendants assert that their opinions must be upheld under the *Chevron* doctrine because the opinions reflect a permissible construction of IGRA. Plaintiffs disagree. They argue that the statute is ambiguous and that Defendants are ignoring the application of the Indian canon of construction.

Federal courts have outlined what is commonly known as the Indian canon of construction. As the Supreme Court noted in *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, "[w]hen we are faced with [ ] two possible constructions, our choice between them must be dictated by a principle deeply rooted in this Court's Indian jurisprudence: '[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" 502 U.S. 251, 112 S.Ct. 683 (1992) (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766, 105 S.Ct. 2399, 2403 (1985)). This is also known as the *Blackfeet* presumption. As the Ninth Circuit has determined,

> [t]he *Blackfeet* presumption simply requires that, when there is doubt as to the proper interpretation of an ambiguous provision in a federal statute enacted for the benefit of an Indian tribe, "the doubt [will] benefit the Tribe, for '[a]mbiguities in federal law have been construed generously in order to comport with . . . traditional notions of sovereignty and with the federal policy of encouraging tribal independence.

*Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 729 (9th Cir. 2003)(quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 152, 102 S.Ct. 894 (1982)). The Ninth Circuit has also determined that the IGRA was enacted to benefit Indian tribes. *Id.* at 730 (citing 25 U.S.C. § 2702(1)).

-16-

It is unclear whether *Chevron* deference is controlling over the *Blackfeet* presumption when the two conflict.  For example, in *Artichoke Joe's*, the Ninth Circuit noted that *Chevron* deference trumps the Indian canon of construction, but there, application of *Chevron* deference and the *Blackfeet* presumption did not lead to disparate results.  353 F.3d at 730 (citing *Williams v. Babbitt*, 115 F.3d 657, 663 n.5 (9th Cir. 1997)).  However, a split between the circuit courts exists on this issue.  *See e.g.*, *Navajo Nation v. Department of Health & Human Services*, 325 F.3d 1133, 1136 n. 4 (9th Cir. 2003) (noting existence of split); *Williams v. Babbitt*, 115 F.3d 657, 663 n.5 (9th Cir. 1997) (finding *Chevron* deference controlling over Indian canon); *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1461-62 (10th Cir. 1997) (determining that *Blackfeet* presumption trumps *Chevron* deference); *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 59 (D.C. Cir. 1991) (holding that *Blackfeet* presumption overrides *Chevron* deference); *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (same).  Two other circuits have avoided the issue in creative ways.  For example, in *Shakopee Mdewakanton Sioux Community v. Hope*, the Eighth Circuit determined that the NIGC had interpreted the IGRA in favor of the Indians in accordance with the Indian canon of construction by protecting "Indian gaming from corrupting influences," despite the fact that the relevant Indian tribe in the case strongly disagreed with the outcome.  16 F.3d 261, 264-65 n.6 (8th Cir. 1994).  *See also, Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1090 n.15 (Fed. Cir. 2003) (noting that "[b]ecause we conclude that the 'shall remain available' language was not ambiguous, we need not address what role, if any, the Indian canon of statutory construction, or the *Chevron* doctrine, would have here" (citations omitted)).

The Sixth Circuit has not explicitly resolved the issue regarding which rule should control in a case in which the rules come into conflict.  In *Grand Traverse Band of Ottawa and*

-17-

*Chippewa Indians v. Office of the U.S. Attorney for the Western District of Michigan (Grand Traverse III)*, a case addressing the restored lands exception at issue in this case, the Sixth Circuit acknowledged the importance of the Indian canon:

> . . . the Supreme Court repeatedly has held that "'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit. This canon is "rooted in the unique trust relationship between the United States and the Indians." The force of this interpretive canon can be overcome only when "other circumstances evidencing congressional intent" demonstrate that "the statute is 'fairly capable' of two interpretations . . . [or] that the [conflicting] interpretation is fairly 'possible.'"
> The State has pointed to no evidence of Congressional intent that would forbid this Court from invoking the canon of statutory construction applied to statutes affecting Indians and their trust relationship with the United States. Indeed, the only evidence of intent strongly suggests that the thrust of the IGRA is to promote Indian gaming, not to limit it. *See* 25 U.S.C. § 2702(1) . . . Although § 2719 creates a presumptive bar against casino-style gaming on Indian lands acquired after the enactment of the IGRA, that bar should be construed narrowly (and the exceptions to the bar broadly) in order to be consistent with the purpose of the IGRA, which is to encourage gaming.

369 F.3d 960, 971 (6th Cir. 2004) (citations and quotations omitted). Finally, at least one law review article has argued that where a statute is ambiguous, the Indian canon should trump *Chevron* deference if the agency's decision is adverse to Native American interests. *See* Scott C. Hall, *The Indian Law Canons of Construction v. The Chevron Doctrine: Congressional Intent and the Unambiguous Answer to the Ambiguous Problem*, 37 CONN. L. REV. 495 (2004).

This court previously declined to determine whether the *Blackfeet* presumption trumps *Chevron* deference. Instead, the magistrate determined that a likelihood of success on the merits existed that the February 14th Opinion was arbitrary and capricious. [Court Doc. No. 40, 50]; *Sault Ste. Marie Tribe of Chippewa Indians v. United States*, No. 2:06cv276, 2007 WL 2479293 *11-12 (W.D. Mich. Aug. 28, 2007). Thus, the magistrate concluded the February 14th Opinion did not warrant deference.

The issue of whether the Indian canons should trump *Chevron* deference is a difficult one. There is a circuit split on the issue with at least two circuits carefully skirting around it. The Sixth Circuit has not provided this court with any explicit guidance regarding its position on this issue; however, the *Grand Traverse III* decision suggests, in a discussion of the Indian canon, that the purpose of the IGRA is to promote Indian gaming.

Defendants argue that the Indian canon must benefit all tribes to be applicable, relying on *Confederated Tribes of Chehalis Indian Reservation v. State of Washington*. 96 F.3d 334 (9th Cir. 1996). In that case the Ninth Circuit found that the Indian canons "were of no help to the Tribes in their claim to Quinault fishing rights because of the countervailing interests of the Quinaults" and that "[t]he government owes the same trust duty to all tribes, including the Quinault." *Id.* at 340. In that case the plaintiff tribes' interests were in direct opposition to the defendant Quinault tribe's interests.

Defendants further claim that if the Tribe's de facto reservation argument prevails, such a ruling will be at odds with the position taken by other tribes in cases like *MichGO*, 477 F.Supp.2d 1 and *Citizens Exposing Truth about Casinos (CETAC) v. Kempthorne*, 492 F.3d 460 (D.C. Cir. 2007). However, in making this argument Defendants appear to misunderstand the Tribe's argument pertaining to de facto reservation. In *MichGO* the plaintiffs sought to prevent a tribe from building a casino under the "initial reservation" exception to the IGRA. The tribe, as well as the government, agreed that the tribe's proposed casino met the requirements of the "initial reservation." The plaintiff citizen group argued that under *Sac and Fox Nation of Missouri v. Norton*, the parcel of land needed to have housing on it to be a reservation. 240 F.3d 1250 (10th Cir. 2001). The court disagreed. *Id.* at 8. In *CETAC* the court also determined that

the definition of reservation did not require housing.   429 F.3d at 469.  The Tribe is not arguing

here that a de facto reservation must have housing to be a reservation; it is merely arguing that

when looking at the *entirety* of the uses of the 1983 Trust Parcel, which include housing, along

with an established tribal government, as well as a plethora of other community services, it meets

the ambiguous definition of reservation under IGRA.  Thus, the Tribe's position is not contrary

to the position of the tribes in *MichGO* and *CETAC*.

Furthermore, there is no other tribe currently opposing the Tribe's construction and

operation of a new casino on the 2000 Trust Parcel.  Thus, the situation in this action is far

different from the situation in *Confederated Tribes of Chehalis* in which the interests of several

tribes were diametrically opposed.  96 F.3d 334.  In this action, it is impossible to know whether

this court's ruling will conflict with some future unknown interest of some other tribe.  However,

the court refuses to speculate about how its ruling may be to the detriment of other tribes in other

situations not applicable here.

Even apart from the fact that the Sixth Circuit has cited to the Indian canon with favor

and expressed that the purpose of IGRA is to promote Indian gaming, there is good reason for

applying the Indian canon over *Chevron* deference.  Whereas *Chevron* promotes a general rule of

deference to agency determinations, the Indian canon provides specific guidance regarding the

interpretation of statutes relating to Indian tribes.  *See Ramah*, 112 F.3d at 1462 (determining that

"canon of construction favoring Native Americans controls over the more general rule of

deference to agency interpretations of ambiguous statutes").  For these reasons, this court will

apply the Indian canon of construction in this action to interpret ambiguous provisions of the

IGRA where it conflicts with *Chevron* deference.

### III.     Analysis

The IGRA's purpose is stated in relevant part in 25 U.S.C. § 2702:

(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;
(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; . . .

25 U.S.C. § 2702.  The IGRA prohibits gaming on lands taken into trust by the government after

October 17, 1988 unless certain exceptions apply:

(a) Prohibition on lands acquired in trust by Secretary
Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless–
(1) such lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988; . . .
(b) Exceptions
(1) Subsection (a) of this section will not apply when – . . .
(B) lands are taken into trust as part of – . . .
(iii) the restoration of lands for an Indian tribe that is restored to Federal recognition.

25 U.S.C. §§ 2719(a)(1), 2719(b)(1)(B)(iii).

These two exceptions, the "contiguous to a reservation" exception and the "restored

lands" exception, are at issue here.  The Tribe argues that both exceptions should apply to the

2000 Trust Parcel.  The Defendants disagree and assert that neither exception applies.

### A.     Applicability of the § 2719(a)(1) Exception

This court has previously determined that the Tribe demonstrated a likelihood of success

on the merits that the Department's February 14th Opinion was arbitrary and capricious.  [Court

Doc. Nos. 50, 40].  The court will begin by summarizing the Department's reasoning for its

conclusions explained in the February 14th Opinion letter.

Unfortunately the IGRA does not define the crucial term "reservation."  The February 14th Opinion attempts to define the term, but its definition is murky, at best.  The opinion asserts:

> We interpret the IGRA definition of reservation as encompassing land within the existing boundaries of a reservation set aside by treaty, Executive Order, or statute; land Congress expressly legislates to be reservation, and land proclaimed by the Secretary pursuant to 25 U.S.C. § 467 as reservation under the IRA.  *The IGRA definition also would include land granted reservation status through court order when the United States is a party and, as discussed further below, land considered reservation within the meaning of 18 U.S.C. § 1151(a).*  None of the above methods is applicable in this case; the Tribe admits that the 1983 parcel does not have formal reservation status through any of the above methods.

A.R., p. 10 (emphasis added).  After analyzing the dearth of authority illuminating the definition of reservation in the IGRA, the opinion continues:

> The 1983 parcel is outside the boundaries of an existing proclaimed reservation.  As the IGRA maintains a distinction between reservation and trust land, we find that the plain meaning of reservation in § 2703(4) of the IGRA, as commonly understood by Congress when it drafted the statute, is land set aside by the federal government as the Tribe's permanent home, for its occupation and communal residency, for its seat of government, *and land included within the meaning of Indian country 1151(a).*  The 1983 parcel does not fall within these parameters.  We interpret reservation under the IGRA consistent with the distinction made under the IRA, maintaining the distinction made in the IRA between acquiring land in trust outside a tribe's reservation and the optional second step of proclaiming it a reservation.  A reservation under the IGRA does not include all trust land acquired under the IRA, nor does it include all land acquired for housing.  Taking property in trust under the IRA primarily for a housing development does not make that property a reservation under the IGRA without a proclamation.
> In this circumstance, we interpret the IRA and the IGRA consistently.  We interpret reservation under the IGRA to require more than trust land acquired for purposes of HUD housing when the Tribe already has a proclaimed reservation intended to be its land base or homeland.  In contrast, reservations proclaimed under the IRA are reservations for purposes of the IGRA.  The notice of the acquisition of land for HUD housing does not entail the same scope as a proclamation of a reservation. . . . We conclude that land taken in trust under the IRA is not *per se* reservation under the IGRA.  Further, we find that the use of the trust land for Indian residential uses is not alone sufficient to make land, taken

-22-

into trust under the IRA outside the boundaries of an existing reservation, a reservation under the IGRA.  Absent additional evidence that indicates a federal intent that the 1983 parcel was to serve as the Tribe's permanent settlement, it is not a reservation within the meaning of the IGRA.

When the Tribe has a formal or declared reservation, we do not find that a housing development on trust land outside the boundaries of that reservation is a reservation for purposes of the IGRA.

A.R., pp. 14-15 (emphasis added).

During the preliminary injunction hearing in this case, the magistrate judge asked the

Defendants' counsel what standards the Department used when determining whether it was going

to make a reservation proclamation.  Counsel for the Department stated in response:

> . . . there's nothing that's particularly onerous on the Tribe.
> What the Department does is they get the Reservation request.  They notify – there's a duty to notify all the local counties, and they send it out for comment.  And they get comments back about, you know, what is going to be the impact on the local community if this land typically will be taken out of the tax base is made, first into Trust and then into a Reservation.
> But there is not the kind of homeland analysis that is suggested as necessary here.  It's, you know, a discretionary decision that is not – does not require any particular showing, I don't think, from the Tribe, that it was used or intended to be a permanent homeland settlement.

[Court Doc. No. 37, p.76].

The magistrate judge also asked the Department's counsel about the Tribe's request for a

proclamation in 1988.  In response, the government attorney stated:

> And was that – is that a problem for the Department?  Yeah.  They should have – they should have processed the request.  But the Tribe, on the other hand, didn't do anything about it either until now, you know, more than, you know, sixteen years later.  Back since 1991 the Tribe wasn't asking about it either.  So I think there's a little bit of responsibility on both sides for that.  But, you know, sure, the Department dropped the ball on that.

*Id.* at p. 78.  The Defendants argue that a reservation requires "[s]ome degree of formal

recognition," but they admitted during the preliminary injunction hearing that the February 14[th]

-23-

Opinion "is clearly struggling with this definition of Reservation." *Id.* at pp. 70, 64.

The magistrate's report and recommendation indicated his frustration with trying to understand how the Defendants defined the term "reservation" in the IGRA.  The report and recommendation states in part:

> During oral argument, counsel for Defendants conceded that the 1983 parcel in St. Ignace was for all practical purposes identical in use to the reservation land of the Tribe located in Sault Ste. Marie, Michigan.  Although the use of the two parcels of land appears to be identical, one is considered a reservation and the other is not. At the same time, a Sugar Island parcel of land, which has very few uses by the Tribe, was considered reservation land by proclamation.  During oral argument, the undersigned repeatedly attempted to have counsel for the Defendants identify what factors are utilized in determining whether a parcel of land is reservation land.  Counsel was unable to clarify this for the Court.  In fact, at the conclusion of oral argument, it appeared to the undersigned that Defendants' position is that land is reservation land if Defendants conclude it is, and is not reservation land if they conclude otherwise.

[Court Doc. No. 40, pp. 15-16].

Just as the Defendants struggle to define reservation, the federal courts have made little progress on defining the parameters of a reservation under the IGRA.  The Tenth Circuit has come closest to attempting to define what a reservation is under the IGRA in *Sac and Fox Nation of Missouri v. Norton*.  240 F.3d 1250 (10th Cir. 2001).  In that case the circuit court addressed whether the Secretary of the Interior could take a tract of land in downtown Kansas City into trust for the Wyandotte Tribe for gaming activities pursuant to the IGRA.  *Id.*  The tract was contiguous to a tribal burial ground known as the Huron Cemetery.  *Id.* at 1254.  The plaintiffs were two other Indian tribes, as well as the Governor of Kansas who sought to prevent the tract from being taken into trust for gaming purposes.  *Id.* at 1253.  The court specifically addressed application of the exception under IGRA for gaming on land contiguous to a reservation found in 25 U.S.C. § 2719(a)(1).  The court addressed whether the Huron Cemetery constituted a

"reservation" within the meaning of § 2719(a)(1).  The Associate Solicitor for the Division of

Indian Affairs at the Department of the Interior issued an opinion indicating that the Huron

Cemetery was a reservation for purposes of § 2719(a)(1) and that the Wyandottes could conduct

gaming on the tract contiguous to the cemetery.  *Id.* at 1256.  The Tenth Circuit concluded that

the Secretary of the Interior had not been "charged with administering the IGRA," and "because

the Secretary lacked authority to interpret the term 'reservation,' as used in IGRA, we owe no

deference to his interpretation."  *Id.* at 1265.  The court then explained its position:

> The parties disagree on the established meaning of the term "reservation."
> The Secretary suggests its established meaning broadly refers to any parcel of land
> set aside by the federal government for Indian use.  This position is arguably
> supported by language found in older Supreme Court cases, *e.g., Spalding v.*
> *Chandler*, 160 U.S. 394, 403, 16 S.Ct. 360, 40 L.Ed. 469 (1896) . . . In contrast,
> plaintiffs argue that the established common-law meaning of the term
> "reservation," as used in the context of Indian tribes, refers to land set aside by the
> federal government for the occupation of tribal members.  Plaintiffs' position is
> supported by the leading treatise on Indian law, which indicates that "[t]he term
> 'Indian reservation' originally had meant any land reserved from an Indian cession
> to the federal government regardless of the form of tenure."  F. Cohen, *Handbook*
> *of Federal Indian Law* at 34 (1982 Edition).  The treatise goes on to state:
> "During the 1850's, the modern meaning of Indian reservation emerged, referring
> to land set aside under federal protection for the residence of tribal Indians,
> regardless of origin.  By 1885 this meaning was firmly established in law."
> Without deciding which party's view of the established meaning of the
> term "reservation" is correct, we conclude that the interpretation forwarded by
> plaintiffs is the one Congress intended to adopt when it enacted IGRA.  As noted
> by plaintiffs, IGRA's use of the phrase "the reservation of the Indian tribe" in 25
> U.S.C. § 2719(a)(1), suggests that Congress envisioned that each tribe would have
> only one reservation for gaming purposes. . . .
> Applying what we believe to be the proper definition of the term
> "reservation" for purposes of IGRA to the facts of this case, it is apparent that the
> Huron Cemetery does not fall within that definition.  Although the Huron
> Cemetery was reserved by the federal government in the 1855 treaty, it is
> uncontroverted that the reservation was made strictly for purposes of preserving
> the tract's status as a burial ground.  It is further uncontroverted that, since the
> time of the 1855 treaty, the Huron Cemetery has not been used by the Wyandotte
> Tribe for purposes of residence.  Rather, the tract, which is now separated by a
> significant distance from the actual reservation of the Wyandotte Tribe in

> Oklahoma, has consistently maintained its character as a public burial ground.
>      For these reasons, we conclude the Secretary's determination, that the Huron Cemetery is a "reservation" for purposes of IGRA, and his resulting determination that the Shriner Tract can be used by the Wyandotte Tribe for gaming purposes under the IGRA (25 U.S.C. § 2719(a)(1)), was incorrect.

*Id.* at 1266-1267.

Since the *Sac and Fox Nation* decision, Congress enacted legislation "'stating that the authority to determine whether land is a 'reservation' was *delegated to the Secretary* as of the effective date of IGRA.'" *MichGO*, 477 F.Supp.2d at 7 (quoting *City of Roseville v. Norton*, 348 F.3d 1020, 1029 (D.C. Cir. 2003) and citing Pub.L. No. 10763, § 134 (2001)).  The district court in *MichGO* concluded that the "Secretary's interpretation of the term 'reservation' is owed *Chevron* deference."  477 F.Supp.2d at 7.  In that case the district court deferred to the Secretary's conclusion that reservation did not "include a housing requirement."  *Id.* at 8.  The district court deferred to the Secretary's interpretation of "reservation" that was broader than the one followed by the Tenth Circuit in *Sac and Fox*, and the court also invoked the Indian canon of construction.  *Id.* at 8.

In *CETAC*, the D.C. Circuit addressed the meaning of the "initial reservation" exception in 25 U.S.C. § 2719(b)(1)(B)(ii), an exception not at issue in this action, but an exception that required the court to consider the meaning of reservation under IGRA.  492 F.3d 460 (D.C. Cir. 2007).  In that case the D.C. Circuit rejected the Tenth Circuit's interpretation of "reservation" in *Sac and Fox*.  Instead, the D.C. Circuit relied on a broader definition from Felix S. Cohen's *Handbook of Federal Indian Law* (1982 ed.).  The court quoted the handbook and noted that the

> "use of the term 'reservation' from public land law soon merged with the treaty use of the word to form a single definition describing federally-protected Indian tribal lands without any particular dependence on source.  This definition of the term 'reservation' has since been generally used and accepted."  Tellingly, in the

> "generally used and accepted" definition of "reservation," there is no reference to
> a requirement that the land be used as housing in order to qualify as a
> "reservation."

492 F.3d at 468 (quoting Felix S. Cohen, *Handbook of Federal Indian Law*, pp. 34-35 n. 66

(1982 ed.)).  The court concluded that the plaintiffs "fail[ed] to demonstrate that the word

'reservation' has an established meaning that would limit it to lands used for tribal housing."  *Id.*

at 469.  Thus, the court agreed with the Secretary's determination to proclaim the land taken into

trust as reservation and used a broader definition of reservation than the one followed by the

Tenth Circuit in *Sac and Fox*.  Few other cases have addressed, even obliquely, the meaning of

"reservation" for purposes of the IGRA.

Other statutes and regulations define the word "reservation" in other contexts.  For

example, the IRA provides that the Secretary of the Interior has the authority to acquire lands

"for the purpose of providing land for Indians."  25 U.S.C. § 465.  The title to any such land

"shall be taken in the name of the United States in trust for the Indian tribe or individual Indian

for which the land is acquired . . ."  *Id.*  The IRA also authorizes the Secretary to "proclaim new

Indian reservations on lands acquired pursuant to any authority conferred by this Act, or to add

such lands to existing reservations."  25 U.S.C. § 467.  The regulations pursuant to the IRA

define reservation in relevant part as "that area of land over which the tribe is recognized by the

United States as having governmental jurisdiction . . ."  25 C.F.R. § 151.2.

Other decisions also provide a broad interpretation of reservation in other areas of law.

For example, in *Oklahoma Tax Comm. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*,

the U.S. Supreme Court addressed whether the state of Oklahoma could tax sales of cigarettes

sold at a convenience store in Oklahoma on land held in trust for the Potawatomi Tribe by the

United States.  498 U.S. 505, 507, 111 S.Ct. 905, 908 (1991).  There, the Supreme Court

addressed Oklahoma's argument that the convenience store was not located on a formal

reservation.  The Court concluded:

> Oklahoma argues that the tribal convenience store should be held subject to state
> tax laws because it does not operate on a formally designated "reservation," but
> on land held in trust for the Potawatomis.  Neither *Mescalero* nor any other
> precedent of this Court has ever drawn the distinction between tribal trust land
> and reservations that Oklahoma urges.  In *United States v. John*, 437 U.S. 634, 98
> S.Ct. 2541, 57 L.Ed.2d 489 (1978), we stated that the test for determining whether
> land is Indian country does not turn upon whether that land is denominated "trust
> land" or "reservation."  Rather, we ask whether the area has been " 'validly set
> apart for the use of the Indians as such, under the superintendence of the
> Government.'"

498 U.S. at 511, 111 S.Ct. 905, 910 (citing *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93

S.Ct. 1267 (1973) and quoting *John*, 437 U.S. at 648-649).

In *Arizona Public Service Co. v. Environmental Protection Agency*, the D.C. Circuit

deferred to the Environmental Protection Agency's ("EPA") broader view of the definition of

"reservation," relying in part on the decision in *Oklahoma Tax Comm.* 211 F.3d 1280 (D.C. Cir.

2000).  In that case the court addressed whether to apply *Chevron* deference to the EPA's

decision to include tribal trust lands and Pueblos within the definition of "reservation" in the

Clean Air Act where the term was not defined in the Act.  *Id.* at 1283-84.  The Clean Air Act

provided that Native American nations could regulate air quality on land within reservations.  *Id.*

In determining whether to defer to the EPA's determination of the definition of reservation, the

D.C. Circuit noted:

> Significantly, the [Clean Air] Act nowhere defines "reservation."
> Therefore, we look to the term's ordinary and natural meaning, and the context in
> which the term is used.  And we must remain cognizant of the rule that courts
> construe federal statutes liberally to benefit Native American nations.  The
> dictionary defines "reservation" to be a "tract of public land set aside for a

particular purpose (as schools, forest, or the use of Indians)."  WEBSTER'S THIRD NEW INT'L DICTIONARY 1930 (1993).  This definition surely encompasses both trust lands and formally designated reservations.  Nothing in the United States Code is clearly to the contrary, for the term "reservation" has no rigid meaning as suggested by petitioners.  *See* 7 U.S.C. § 1985(e)(1)(A)(ii) . . .; *id.* § 2012(j) . . . ; 25 U.S.C. § 1452(d) . . . ; *id.* § 1903(10) . . .; *id.* § 3103(12) . . .; 33 U.S.C. § 1377(h)(1) . . .

These varying definitions of "reservation" lay to waste petitioners' argument.  Petitioners appear to assert that, in the absence of any specific definition, "reservation" as used in the 1990 Amendments to the Act can only mean the formal reservation contemplated by 25 U.S.C. § 467.  This is a specious contention.  First, § 467 does not purport to offer an exclusive definition of "reservation"; it simply defines the terms under which federal land is formally designated a reservation.  Second, if Congress had wanted to limit the term "reservation" as petitioners suggest, Congress could have done so.  Indeed, Congress on many occasions has defined "reservation" in terms of other statutes. . . . Moreover, given the varying definitions of the term used throughout the Code, it would be a curious result indeed for this court to insist that the absence of a definition requires EPA to advance the most restrictive definition as put forth by petitioners.

. . . we turn to step two of the *Chevron* inquiry.  That is, did the Agency reasonably interpret the term "reservation" to include formal reservations, Pueblos, and trust lands?  EPA supported its interpretation of "reservation" by looking to relevant case law, in particular Supreme Court precedent holding that there is no relevant distinction between tribal trust land and reservations for the purpose of tribal sovereign immunity.  *See Oklahoma Tax Comm'n*, 498 U.S. at 511, 111 S.Ct. 905.  This view is consonant with other federal court holdings that an Indian reservation includes trust lands. . . . In light of the ample precedent treating trust land as reservation land in other contexts, and the canon of statutory interpretation calling for statutes to be interpreted favorably towards Native American nations, we cannot condemn as unreasonable EPA's interpretation of "reservations" to include Pueblos and tribal trust land.

211 F.3d at 1292-93 (citations omitted).

In the context of establishing criminal jurisdiction, courts have been more flexible with the definition of "reservation" as well.  18 U.S.C. § 1151 defines the term "Indian country" for purposes of establishing criminal jurisdiction.  The February 14th Opinion referred to 18 U.S.C. § 1151 for guidance on the meaning of reservation, but Defendants subsequently clarified their view in their December 8, 2006 letter.  The statute states that "Indian country":

means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, . . . (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished. . . .

18 U.S.C. § 1151.

In *United States v. Azure*, the Eighth Circuit addressed whether federal criminal jurisdiction existed over a criminal defendant who lived on land outside the boundary of the formal reservation that was held in trust by the United States. 801 F.2d 336 (8ᵗʰ Cir. 1986). The court determined that jurisdiction existed and noted that:

> It is well established that the actions of the federal government in its treatment of Indian land can create a *de facto* reservation, even though the reservation was not created by a specific treaty, statute or executive order. Among the key factors in the finding of a *de facto* reservation in *Sac & Fox Tribe* were the actions of the BIA in expending funds and providing social services for the area.
> In *United States v. John*, 437 U.S. 634, 649, 98 S.Ct. 2541, 2549, 57 L.Ed.2d 489 (1978), the Supreme Court, in discussing land held in trust by the United States for the Mississippi Choctaw Indians, noted that "there is no apparent reason why these lands, which had been purchased in previous years for the aid of those Indians, did not become a 'reservation,' at least for the purposes of federal criminal jurisdiction at that particular time." Similarly, it would appear here that the Indian trust land, although not within the boundaries of the Turtle Mountain Reservation, can be classified as a *de facto* reservation, at least for purposes of federal criminal jurisdiction.

801 F.2d at 338-39 (citing *Mattz v. Arnett*, 412 U.S. 481, 490, 93 S.Ct. 2245, 2250 (1973); *Sac & Fox Tribe v. Licklider*, 576 F.2d 145, 149-50 (8ᵗʰ Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978)) (other citations omitted). *But see, United States v. Stands*, 105 F.3d 1565, 1572 n.3 (8ᵗʰ Cir. 1997).

In *United States v. Anthony*, an unpublished Sixth Circuit decision, the Sixth Circuit reviewed the criminal conviction of a defendant who was an Indian and whose alleged criminal activities occurred at a "Sault Ste. Marie Housing Project in St. Ignace," the very area at issue in

this case.  No. 94-1652, 1994 WL 735269, 47 F.3d 1170 (6ᵗʰ Cir. Jan. 12, 1994).  The parties

stipulated that the acts occurred in "'Indian county' [sic] as defined by 18 U.S.C. § 1151."  *Id.* at

*1.  The court emphasized that 18 U.S.C. § 1151 "defines 'Indian country' in relevant part as (a)

<u>all land within the limits of any Indian reservation under the jurisdiction of the United States</u>

<u>Government</u> . . ."  *Id.* at *1 n.3.  In reviewing the question of jurisdiction, the Sixth Circuit

concluded that enough evidence existed to establish jurisdiction and that "both government and

defense witnesses, including defendant himself, testified at trial that the victim lived on a

reservation . . . ."  *Id.* at *2.

Thus, federal courts have been tasked with defining an Indian reservation in various

contexts in which the word has not been defined.  In this action, the Defendants ask this court to

defer to their interpretation of reservation, which is narrower and more restrictive than

Defendants' positions in many of the cases cited *supra*, even ones decided as recently as 2007.

*See e.g.*, *Sac and Fox*, 240 F.3d at 1256; *MichGO*, 477 F.Supp.2d 1.  The court understands that

"[a]n agency's interpretation of a statute is entitled to no less deference . . . simply because it has

changed over time.  'On the contrary, the agency, to engage in informed rulemaking, must

consider varying interpretations and the wisdom of its policy on a continuing basis.'" *National

Home Equity Mort. Ass'n v. Office of Thrift*, 373 F.3d 1355, 1360 (D.C. Cir. 2004) (quoting

*Chevron*, 467 U.S. at 863-64, 104 S.Ct. at 2791).   However, it is also true that "an agency must

provide a 'reasoned analysis' for its change in course." *National Home Equity Mort. Ass'n*, 373

F.3d at 1360 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins.*, 463

U.S. 29, 57, 103 S.Ct. 2856, 2873 (1983)).   In a case involving the Department's interpretation

of an undefined term in the IRA, the D.C. district court noted that "'[a] statutory interpretation . .

-31-

. that results from an unexplained departure from prior [agency] policy and practice is not a reasonable one.'" *Indian Educators Federation of Local 4524 of the American Federation of Teachers, AFL-CIO v. Kempthorne*, 541 F.Supp.2d 257 (D.D.C. 2008) (quoting *Northpoint Tech. Ltd. v. Federal Communications Comm.*, 412 F.3d 145, 156 (D.C. Cir. 2005)).

Defendants now insist that only land that has been proclaimed to be a reservation through an executive order, an act of Congress, or through the agency process outlined in 25 U.S.C. § 467 can be a reservation.  It is true that newly enacted regulations support the Defendants' view.  *See* 25 C.F.R. § 292.2.  The new regulations interpreting the IGRA, which became effective on June 19, 2008–well after the February 14th Opinion–state in relevant part:

> Reservation means:
>
> (1) Land set aside by the United States by final ratified treaty, agreement, Executive Order, Proclamation, Secretarial Order or Federal statute for the tribe, notwithstanding the issuance of any patent;
> (2) Land of Indian colonies and rancherias (including rancherias restored by judicial action) set aside by the United States for the permanent settlement of the Indians as its homeland;
> (3) Land acquired by the United States to reorganize adult Indians pursuant to statute; or
> (4) Land acquired by a tribe through a grant from a sovereign, including pueblo lands, which is subject to a Federal restriction against alienation.

25 C.F.R. § 292.2.  Although this definition confirms the Defendant's most recent interpretation of the word "reservation," its recent promulgation reinforces this court's view that the definition of "reservation" in IGRA was highly ambiguous at the time of the February 14th Opinion.  Further, this court must review the Defendants' actions at the time of the decision, not in hindsight.  *See e.g., Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244 (1973) (noting that under the APA "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"); *Shell Offshore Inc. v.*

-32-

*Babbitt*, 238 F.3d 622, 630 n.8 (5th Cir. 2001).

Several factors weigh in favor of the Tribe's position in this action. In applying Step One of the *Chevron* analysis, the court finds that the definition of reservation in IGRA was ambiguous as of the date of the February 14th Opinion. The statute does not define the term, and the parties agree that only *Sac and Fox* attempts to define the term within the meaning of the "contiguous to a reservation" exception under IGRA. The Defendants themselves have outlined several different definitions of the term. There is the broad definition in cases like *Sac and Fox* and *MichGO*, the initial definition in the February 14th Opinion, and the Defendants' "clarification" definition from their December 8, 2006 letter, which tracks the definition of 25 C.F.R. § 292.2. The Defendants have changed course several times, without adequate explanation of their reasoning for doing so, especially within the context of the February 14th Opinion and the subsequent clarification of the definition in their letter dated December 8, 2006. Thus, this court moves to Step Two of the *Chevron* analysis.

As noted *supra*, the Indian canon of construction requires that statutes intended for the benefit of Indians should be interpreted in favor of the Indians where they are ambiguous. This court has already determined that the canon should control over *Chevron* deference where there is conflict. In addition, the February 14th Opinion does not apply the Indian canon to an ambiguous statutory provision. Moreover, the Defendants' determination in the February 14th Opinion does not warrant the same level of deference as it would if the Defendants provided a more reasoned analysis for their many reversals of position. *See National Home Equity Mort. Ass'n*, 373 F.3d at 1360.

Further, Defendants admit that, prior to the enactment of the IGRA in 1988, the Tribe

-33-

asked that the Department proclaim the 1983 Trust Parcel to be a reservation. There is also disputed evidence that the Tribe sought reservation status in 1986, although the resolution of this issue is not essential to a decision on the cross motions for summary judgment. The Defendants admit they "dropped the ball" with respect to the Tribe's application, but they contend that the Tribe bears equal responsibility for Defendants' failure to make any determination regarding the request. However, a primary reason why this matter came up at this late date is that the Secretary failed to act timely on the Tribe's request for a formal determination that the 1983 Trust Parcel was indeed a "reservation."

At this point the court has no guidance on what the Defendants use as guidelines to determine whether a parcel of land should receive formal reservation status. Defendants contend that formal proclamation is the *only* way to achieve reservation status, even though Defendants themselves admit that they refused to make a decision on a request for formal proclamation. Thus, the court sees little way that the Tribe could have complied with Defendants' requirements to obtain reservation status on the 1983 Trust Parcel, despite that fact that the parties admit the 1983 Trust Parcel serves exactly the same purposes, including housing and social services, as land that has been declared to be a Tribal reservation. *See* Payment Aff., ¶¶ 20-22.

The record also demonstrates that the State of Michigan did not object to the construction of the new casino on the 2000 Trust Parcel. *See* A.R., pp. 920-21, 942. The town of St. Ignace supports the development of the casino. *Id.* Nor do Defendants point to another Indian tribe that has objected to the new casino or whose interests would be affected. Such divided interests could affect the application of the Indian canons of construction. Even the Midwest Region of the BIA opined that the 1983 Trust Parcel could be proclaimed to be a reservation retroactive to

-34-

1988.  The new casino is a replacement of an outdated casino that is very close in location to the old casino.  Thus, community concerns pertaining to the development of a new casino are not applicable here because the community has already adjusted to one casino and the new one merely replaces the old one.

It is unclear to the court why Defendants object so strenuously to a finding that the 2000 Trust Parcel fits the "contiguous to a reservation" exception.  There may be some concern that a finding that the 1983 Trust Parcel is a reservation will erode the bounds of the exception, leaving precedent for determinations that all land contiguous to trust land not formally proclaimed to be a reservation fits within the exception.  This court, therefore, limits its determination to the specific, unusual circumstances in this case.  Such circumstances include evidence of an attempt to have the 1983 Trust Parcel proclaimed a reservation in both 1986 and 1988, prior to the enactment of the IGRA.  There is also evidence in the record that Defendants were moving towards a formal proclamation and then "dropped the ball" for inexplicable reasons.  Additional circumstances specific to this case include no evidence of community, state or other tribal opposition and the replacement of an existing casino rather than the development of an entirely new one.  Further, Defendants admit that the 1983 Trust Parcel operates in many senses in the manner of a traditional Indian reservation, complete with Indian housing, other Indian facilities, and Indian governmental jurisdiction.  The Sixth Circuit even found that the 1983 Trust Parcel easily constituted a "reservation" for federal criminal jurisdiction purposes.  *See Anthony*, 1994 WL 735269 at *2.

The court concludes that deference to the February 14th Opinion is unwarranted in light of its conflict with the Indian canon and its confusing definition of "reservation."  The opinion

states that land can only be a reservation if Defendants declare it to be so, but provides no guidance on what factors are considered in making such a declaration.  Defendants appear to ignore any case law that discusses the meaning of reservation in any context and instead rely on their own inability to make a decision on a timely request for a proclamation as evidence of the lack of merit of the request.   Under these specific facts and circumstances, the Secretary should have found that the 1983 Trust Parcel is a reservation.

The court finds it important to reemphasize, however, that its ruling that the 2000 Trust Parcel fits the "contiguous to the boundaries of a reservation" exception is limited to the specific facts of this case.  Going forward, it appears that the definition of reservation pursuant to the IGRA will be less ambiguous with the enactment of 25 C.F.R. § 292.2.  In conclusion, the court determines that the 2000 Trust Parcel fits the contiguous to a reservation exception under the IGRA, 25 U.S.C. § 2719(a)(1).  Therefore, the court will GRANT the Tribe's motion for summary judgment and DENY the Defendants' motion for summary judgment.

### B.        Applicability of the § 2719(b)(1)(B)(iii) Exception

On July 31, 2006 the Defendants issued their opinion relating to the "restored lands" exception under IGRA.  The July 31st Opinion concluded that the Tribe had failed to establish that the 2000 Trust Parcel met the requirements of the restored lands exception.  A.R., p. 16.  In their opinion the Defendants clearly analyzed the legal requirements for establishing the restored lands exception as described in *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the Western District of Michigan*, 198 F.Supp.2d 920, 928 (W.D. Mich. 2002), *aff'd* 369 F.3d 960 (6th Cir. 2004) *(Grand Traverse III)*.

This court will not review the merits of the Tribe's arguments with respect to this

-36-

exception because such analysis is not critical to this decision and would be mere dicta, given

this court's resolution of the "contiguous to a reservation" issue in the Tribe's favor.

**IV.     Conclusion**

Based on the analysis *supra*, the Tribe's motion for summary judgment will be

**GRANTED**.  The Defendants' motion for summary judgment will be **DENIED**.

A separate order will enter.

Dated:   8/29/08                                              */s/ R. Allan Edgar*
                                                         R. ALLAN EDGAR
                                                         UNITED STATES DISTRICT JUDGE